# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued January 16, 2024          Decided June 25, 2024

No. 20-5382

EARTHWORKS, ET AL.,
APPELLANTS

v.

UNITED STATES DEPARTMENT OF THE INTERIOR, ET AL.,
APPELLEES

———

Appeal from the United States District Court
for the District of Columbia
(No. 1:09-cv-01972)

———

*Roger Flynn* argued the cause for appellants.  With him on the briefs was *Jeffrey C. Parsons*.

*W. Eric Pilsk* and *Lori Potter* were on the brief for *amicus curiae* Law Professors in support of appellants.

*Brian Toth*, Attorney, U.S. Department of Justice, argued the cause for federal appellees.  With him on the brief were *Todd Kim*, Assistant Attorney General, and *Amelia G. Yowell*, Attorney.

2

*Elizabeth B. Dawson* argued the cause for intervenors National Mining Association, et al. in support of appellees. With her on the brief were *Shannen W. Coffin*, *Linda C. Bailey*, *Mark C. Savignac*, *Neil Westesen*, *Daniel W. Wolff*, and *Laura K. Granier*.

*Gilman Dana S. Burke* was on the brief for intervenor State of Alaska in support of appellees.

*Eric Grant*, *Andrew R. Varcoe*, *Stephanie A. Maloney*, and *Michael A. Tilghman II* were on the brief for *amici curiae* the Chamber of Commerce of the United States of America and the National Association of Manufacturers in support of appellees.

Before: KATSAS and PAN, *Circuit Judges*, and GINSBURG, *Senior Circuit Judge*.

Opinion for the Court filed by *Senior Circuit Judge* GINSBURG.

Dissenting opinion filed by *Circuit Judge* PAN.

GINSBURG, *Senior Circuit Judge:*  In 2009, the appellants unsuccessfully challenged in the district court a Final Rule issued in 2003 by the Department of the Interior Bureau of Land Management (BLM).  That rule withdrew a proposed rule that would have limited the maximum size of "mill sites" for mining claims on federal lands and instead codified the agency's historical understanding that the governing statute imposes no such limit.  The appellants contend the Final Rule embodies an impermissible interpretation of federal mining law, and that the BLM promulgated it in violation of the National Environmental Policy Act (NEPA) and of the Administrative Procedure Act (APA).  The BLM responds that the appellants

3

lack standing to bring their suit.  We hold the appellants have standing and go on to affirm the judgment of the district court.

## I.  Background

The Mining Law of 1872, codified as amended at 30 U.S.C. §§ 21–53, has allowed people to prospect freely for valuable minerals on federal lands for more than 150 years.  *See, e.g.*, *Union Oil Co. of Cal. v. Smith*, 249 U.S. 337, 346 (1919) ("[The Mining Law] extends an express invitation to all qualified persons to explore the lands of the United States for valuable mineral deposits, and holds out to one who succeeds in making a discovery the promise of a full reward" (cleaned up)).  Under the Mining Law, a prospector who discovers valuable minerals on federal land may "locate," *i.e.*, "stake," a claim on that land.  *See* 30 U.S.C. § 26.  A "located" mining claim is "a fully recognized possessory interest," *United States v. Locke*, 471 U.S. 84, 86 (1985), which its owner may hold as long as he works it each year and complies with other federal, state, and local requirements.  *Orion Rsrvs. Ltd. P'ship v. Salazar*, 553 F.3d 697, 699 (D.C. Cir. 2009).  The Mining Law historically allowed a claim holder to acquire title to his claim through a land patent, but the Congress has imposed a moratorium on new patents since 1994.  *See, e.g.*, *Wyo-Ben Inc. v. Haaland*, 63 F.4th 857, 863–64 & n.5 (10th Cir. 2023).

Section 42 of the Mining Law provides that the holder of a mining claim may also locate nearby non-mineral-bearing land for the purposes of "mining" or "milling":

> Where nonmineral land not contiguous to the vein or lode is used or occupied by the proprietor of such vein or lode for mining or milling purposes, such nonadjacent surface ground may be embraced and included in an application for a patent for such vein or lode, and the same may

4

> be patented therewith . . . ; but no location made
> on and after May 10, 1872, of such nonadjacent
> land shall exceed five acres.

30 U.S.C. § 42(a); *see also* § 42(b) (providing similarly for placer mining claims).  These noncontiguous lands are known as "mill sites."  Miners use them to build "processing facilities and other structures used to support the extraction of minerals from [their] claim."  *Swanson v. Babbitt*, 3 F.3d 1348, 1350 (9th Cir. 1993).  Under current BLM regulations, "valid uses of a mill site include tailings ponds and leach pads, rock and soil dumps, and any other use that is reasonably incident to mine development and operation."  *Ctr. for Biological Diversity v. U.S. Fish & Wildlife Serv.*, 33 F.4th 1202, 1210 (9th Cir. 2022) (cleaned up).

In 1997, the Department of the Interior then-Solicitor John Leshy issued a novel legal opinion concluding that Section 42 prohibits a claim holder from locating more than a total of five acres of mill-site land with respect to any one mining claim.  U.S. Dep't of the Interior, Office of the Solicitor, Limitations on Patenting Millsites under the Mining Law of 1872, M-36988 (Nov. 7, 1997) (1997 Opinion).  Two years later, the BLM proposed and solicited public comments on a new regulation to implement that view.  *See* Locating, Recording, and Maintaining Mining Claims or Sites, 64 Fed. Reg. 47,023, 47,028, 47,037 (Aug. 27, 1999).  The Congress, however, passed appropriations bills with riders prohibiting the BLM from implementing the Leshy interpretation during the 1999 and 2000 fiscal years, *see* Emergency Supplemental Appropriations, Pub. L. No. 106-31, § 3006(c), 113 Stat. 57, 90–91 (1999); Consolidated Appropriations Act 2000, Pub. L. No. 106-113, § 337(a), 113 Stat. 1501, 1501A-199 (1999), the latter of which stated it represented neither approval nor disapproval of the interpretation.  113 Stat. 1501A-199.

5

In 2003, the Solicitor's Office issued a new opinion reject-ing the legal conclusion of the 1997 Opinion. U.S. Dep't of the Interior, Office of the Solicitor, Mill Site Location and Patenting under the 1872 Mining Law, M-37010 (Oct. 7, 2003). The BLM then announced it had "decided to withdraw the [1999] proposed amendment to the mill site regulations" and promulgated a Final Rule to that effect, effective in November 2003. Locating, Recording, and Maintaining Mining Claims or Sites, 68 Fed. Reg. 61,046, 61,054 (Oct. 24, 2003). After recounting the history of the agency's interpreta-tion of Section 42, the Final Rule document stated in response to public comments that "instead of changing the Department's past prevalent practice and interpretation of the mill site provi-sion, BLM has decided to continue its prevailing practice and interpretation that the Department followed for a half century before the 1997 Opinion." *Id.* The Final Rule specified that, although a claim holder may not locate any one mill site larger than five acres, there is no limit to the number of mill sites it may locate as long as each site is "reasonably necessary" for "efficient and reasonably compact milling or min-ing operations."[*]

---

[*] The Final Rule provides:

How much land may I include in my mill site?

The maximum size of an individual mill site is 5 acres. You may locate more than one mill site per mining claim if you use each site for at least one of the purposes described in § 3832.34 of this part. You may locate only that amount of mill site acreage that is reasonably necessary to be used or occupied

6

Being a Final Rule, it did not call for additional notice-and-comment. Nor did it include an Environmental Impact Statement (EIS); instead, it included an Environmental Assessment and a Finding of No Significant Impact.

In 2009, Earthworks and several other conservation groups sued the Interior Department and the BLM in the district court, challenging the validity of the 2003 Rule under both the NEPA and the APA. On cross-motions for summary judgment, the district court rejected the Department's contention that the appellants lacked standing and ruled in favor of the Department on the statutory issue. *Earthworks v. U.S. Dep't of the Interior*, 496 F. Supp. 3d 472 (2020).

The district court reached four conclusions relevant to this appeal:

1. The appellants had standing to sue the Interior Department challenging the 2003 Rule. *Id.* at 486–89.

2. Section 42 is facially ambiguous regarding the aggregate size of mill sites but, considering the history of the Mining Law, the Department's interpretation of Section 42 is reasonable. *Id.* at 494–96.

3. It was not a violation of the NEPA for the BLM to issue the 2003 Final Rule without an EIS, because the rule "merely codified the BLM's prevailing practice; it effected no change in the status quo on the ground." *Id.* at 496–98.

---

for efficient and reasonably compact milling or mining operations.

68 Fed. Reg. at 61,070–71 (publishing 43 C.F.R. § 3832.32).

7

4.    It was not a violation of the APA for the BLM to promulgate the Final Rule without an additional round of notice-and-comment because the Final Rule was "a logical outgrowth" of the 1999 proposed rule. *Id.* at 498–501.

## II.   Standard of Review

We review *de novo* the entry of summary judgment by the district court. *See, e.g.*, *Defenders of Wildlife v. Zinke*, 849 F.3d 1077, 1082 (D.C. Cir. 2017).

## III.   Standing

The Department maintains that Earthworks and the other appellants lack standing to sue because they allege no injury-in-fact caused by the promulgation of the Final Rule. Instead, it says they merely speculate about the potential effects the mill-site regulation may have on the BLM's approvals of mining operations, without alleging any disruption to the "concrete plans" of their members or any "specific interests" they may have in proposed mill-site lands.

The Department conceives of standing too narrowly. The Supreme Court has unequivocally held that "environmental plaintiffs adequately allege injury in fact when they aver that they use the affected areas and are persons 'for whom the aesthetic and recreational values of the area will be lessened' by the challenged activity." *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 183 (2000) (quoting *Sierra Club v. Morton*, 405 U.S. 727, 735 (1972)). Applying that precedent, our caselaw holds that "[i]f a challenged regulation causes individuals to reasonably fear health or environmental harms and thus prevents them from using or enjoying the aesthetic or recreational value of their area, their injury suf-

8

fices for Article III standing." *Cal. Cmtys. Against Toxics v. EPA*, 928 F.3d 1041, 1049 (2019).

The declaration submitted to the district court by appellant Save the Scenic Santa Ritas adequately alleges this type of injury. Ms. Gayle Hartmann, the declarant and a member of that organization, states that she lives in the region of a proposed open-pit copper mine in Pima County, Arizona, and that she uses the area around the site for "hiking, viewing and enjoying wildlife, enjoying the clear air and unspoiled scenery, and other conservation and recreational uses." She says her use of the area "will be adversely impacted, if not precluded altogether," by the BLM's permitting practices under the Final Rule and the concomitant growth of the mine project.

Nothing in the record suggests Ms. Hartmann's fears are unreasonable or premature. On the contrary, the complaint specifically alleges that the members of Save the Scenic Santa Ritas would suffer aesthetic and recreational injuries at the Pima County site as a result of the Final Rule. The appellants claim the owners of the site propose to use mining claims around the site for "waste, processing, and tailings facilities" — in short, for mill-site purposes. They further assert that under the Final Rule — and another rule not at issue in this appeal — the agency failed to consider and protect the recreational and aesthetic interests that Save the Santa Ritas and its members have in the Pima County site. Buttressing that allegation, the record indicates the proprietor of the proposed mine has located approximately 3,500 acres of mill-site land at the site.

These alleged injuries are of a piece with others we have held establish the injury-in-fact necessary for Article III standing. For example, in *Sierra Club v. Jewell*, 764 F.3d 1 (2014), the plaintiff alleged injury to her recreational use of nearby ar-

9

eas caused by the delisting from the National Register of Historical Places of a battlefield area that coal companies intended to mine, *id.* at 5–6. Similar injuries were alleged in *California Communities Against Toxics*, caused by the Environmental Protection Agency's decision to grant an exception to a rule governing the transport of hazardous material, which waste-disposal companies would likely use in the future to the detriment of those petitioners' health and environmental amenities, 928 F.3d at 1047–49. So, too, in *Clean Wisconsin v. EPA*, 964 F.3d 1145 (2020), owing to a decision of the EPA not to demand stricter state controls on ground-level ozone levels, *id.* at 1156–57; and in *Association of Battery Recyclers, Inc. v. EPA*, 716 F.3d 667 (2013), due to the EPA's decision not to recalculate stringency requirements for sources of airborne lead pollution, *id.* at 672–73.

In this case, we hold the allegations of harm set forth in the declaration of Ms. Hartmann suffice to give her — and the organization of which she is a member — standing to challenge the Final Rule. Because "the presence of one party with standing is sufficient to satisfy Article III's case-or-controversy requirement," *Rumsfeld v. F. for Acad. & Inst'l Rights, Inc.*, 547 U.S. 47, 52 n.2 (2006), we need not consider whether the other appellants also have standing — "the suit may proceed." *Biden v. Nebraska*, 600 U.S. ---, 143 S. Ct. 2355, 2365 (2023).

## IV. The Mining Law

Earthworks and the other appellants claim the BLM's interpretation of Section 42 of the Mining Law set out in the Final Rule is unreasonable. They contend Section 42 unambiguously limits a claimant to one five-acre mill site per mining claim. The agency maintains its interpretation is permissible because Section 42 contains no express limitation on the number of mill

10

sites a claimant may locate, and because its interpretation is
suggested by the history of the statute.

We have no difficulty concluding that the interpretation
embodied in the mill-site regulation represents the better read-
ing of the statute. The operative words of Section 42 plainly
contain no limit on the number of mill sites a claim owner may
locate:

> Where nonmineral land not contiguous to the
> vein or lode is used or occupied . . . for mining
> or milling purposes, such nonadjacent surface
> ground may be embraced and included in an ap-
> plication for a patent for such vein or lode . . . ;
> but no location . . . of such nonadjacent land
> shall exceed five acres.

30 U.S.C. § 42(a); *see also* § 42(b) (providing for mill sites as-
sociated with a placer claim that "[n]o location made of such
nonmineral land shall exceed five acres"). Nothing in these
words, which are substantially unchanged since the 42nd
Congress enacted them more than 150 years ago, *see* 17 Stat.
91, 96, § 15 (1872), suggests a limitation on the number of mill
sites the holder of a mining claim may locate at a claim or a
limitation upon the total acreage of mill-site land a claimant
may locate at a claim. As the Department correctly observes,
a limit on size does not logically necessitate a corresponding
limit on number. Br. of Fed. Appellees at 37.

Earthworks propounds a contrary reading of Section 42
based upon the word "such" in the third clause of subsec-
tion (a):

> [1] Where nonmineral land not contiguous to
> the vein or lode is used or occupied . . . for min-
> ing or milling purposes, [2] *such* nonadjacent

11

> surface ground may be embraced and included
> in an application for a patent for such vein or
> lode . . . ; [3] but no location . . . of *such* nonad-
> jacent land shall exceed five acres.

30 U.S.C. § 42(a) (emphasis added). The appellants advance
the argument made in the 1997 Opinion that the phrase "such
nonadjacent land" in the third clause of subsection (a) refers to
land delimited by the phrase "may be embraced and included
in an application for a patent for [a] vein or lode" in the second
clause. This, they say, creates a "one-to-one relationship" be-
tween each mill site and a corresponding mining claim, thereby
prohibiting a claimant from locating more than five acres —
the maximum size of a single mill-site location — of mill-site
land for any mining claim.

Earthworks, in other words, urges us to ascribe different
meanings to identical uses of the word "such" in successive
clauses. We cannot accept so strained a reading of the statute.
The antecedent of "such" in the second clause of Section 42(a)
is the phrase "nonmineral land not contiguous to the vein or
lode [that] is used or occupied by the proprietor of such vein or
lode for mining or milling purposes." When the third clause of
the statute again uses "such" as part of the phrase "such nonad-
jacent land," the word refers to the same antecedent to which it
referred in the second clause, *viz.*, "nonmineral land not con-
tiguous to the vein or lode [that] is used or occupied . . . for
mining or milling purposes." Contrary to Earthworks' asser-
tion, the antecedent of "such" in the third clause cannot be read
to expand from its previous use in the same sentence suddenly
to encompass the phrase "may be embraced and included in an
application for a patent for [a] vein or lode." The structure of
Section 42 is not so convoluted. The statute first defines mill-
site land to be "nonmineral land not contiguous to the vein or
lode [which] is used or occupied by the proprietor of such vein

12

or lode for mining or milling purposes." It then imposes a five-acre size limit not upon "such [mill-site] land," but rather upon a "*location . . . of* such [mill-site] land," using the term "location" in its technical mining sense. *See, e.g.*, *Location*, def. 4, 1 *Oxford English Dictionary* 1648 (compact ed. 1971) ("The marking out or surveying of a tract of land (*esp.* of a 'claim') or a settlement").[†] Nothing in the use of "such" in the statute implies any limitation on the number of permissible mill-site locations. On the contrary, by saying "no location . . . of such nonadjacent land shall exceed five acres," rather than "*the* location . . . of such nonadjacent land shall *not* exceed five acres," the statute implies more than one mill site may be located at a claim.

Nonetheless, Earthworks urges us to consider the wording of Section 42 in light of the history of the statute and related provisions of the Mining Law, but doing so only strengthens the force of the Department's interpretation. The operative words of Section 42 closely resemble those the Congress used in Section 35 to limit the size of placer claims: "[N]o such location shall include more than twenty acres of land for each individual claimant." 30 U.S.C. § 35. Less than a decade after the enactment of the Mining Law, the Supreme Court held Section 35 imposes no limit on the number of 20-acre placer claims a miner may acquire. *St. Louis Smelting & Refining Co. v. Kemp*, 104 U.S. 636, 651 (1881) ("A limitation is not put upon the sale of the ground located, nor upon the number of locations which may be acquired by purchase, nor upon the number which may be included in a patent"). If Section 35,

---

[†] The conclusion urged by the appellants and adopted by our dissenting colleague follows only if one disregards the phrase "location . . . of" in the key sentence. When that phrase is not ignored, the argument that the statute plainly imposes a five-acre limit upon "all of the nonmineral land that can be claimed in connection with a particular mining claim," below at 13, becomes untenable.

13

which includes the phrase "for each individual claimant" in its words of limitation, imposes no numerical limit on the number of placer claims a miner may acquire, then it follows ineluctably that Section 42, which does not include the "for each individual claimant" limitation, likewise imposes no numerical limit on the number of mill sites a claimant may acquire.

Nor can it be said that the Congress did not know how to impose express limitations on mining claim locations. As the Department points out, the so-called "Lode Law" of 1866, which was superseded by the Mining Law of 1872, contained an express prohibition on a claimant locating more than one mining claim on a single lode: "[N]o location [of a lode claim] hereafter made shall exceed two hundred feet in length along the vein for each locator . . . : *And provided further*, That no person may make more than one location on the same lode." Act of July 26, 1866, § 4, 14 Stat. 251, 252 (1866). This prohibition is conspicuously absent from the corresponding section of the Mining Law. *See* 30 U.S.C. § 23.

For these reasons, we conclude that the grammatical structure and history of Section 42 and the precedent regarding related provisions of the Mining Law support the BLM's interpretation of the statute.‡

---

‡ Our dissenting colleague rests her contrary conclusion upon two late-19th-century administrative decisions. To be sure, governmental interpretations of a statute may be "powerful evidence" of its original meaning if they are "early, longstanding, and consistent." *Kisor v. Wilkie*, 588 U.S. 558, 594 (2019) (Gorsuch, J., concurring in judgment) (emphasis omitted). The interpretations cited in the dissent, however, are early but not longstanding because they are not consistent with subsequent practice. She also cites a handful of Congressional reports from the mid-20th century, but we think these

14

## V.  The NEPA

Earthworks next contends the agency violated the NEPA by failing to prepare an Environmental Impact Statement for the Final Rule.  The NEPA imposes upon federal agencies a statutory duty to include in all proposals for "major Federal actions significantly affecting the quality of the human environment, a detailed [environmental impact] statement by the responsible official."  42 U.S.C. § 4332(2)(C).

Not every federal action is a "major" action that "significantly affect[s]" the quality of the human environment.  *Id.*  An agency is not required to prepare an EIS for a proposed action that it determines, based upon a preliminary "environmental assessment," "will not have a significant effect on the human environment."  *Food & Water Watch v. FERC*, 28 F.4th 277, 282 (D.C. Cir. 2022) (quoting 40 C.F.R. § 1508.13 (2019) (Council on Environmental Quality)).

Pursuant to the APA, "[a]n agency's decision not to prepare an EIS can be set aside only upon a showing that it was 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'"  *Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 763 (2004) (quoting 5 U.S.C. § 706(2)(A)).  "Our role in reviewing an agency's decision not to prepare an EIS is a limited one, designed primarily to ensure that no arguably significant consequences have been ignored."  *Myersville Citizens for a Rural Cmty., Inc. v. FERC*, 783 F.3d 1301, 1322 (D.C. Cir. 2015) (cleaned up).

---

even less persuasive.  These sources reflect only the confusion that surrounded the statute in the mid-20th century, not the intent of the 42nd Congress that had enacted the statute a century earlier.

15

The environmental assessment the BLM prepared for the Final Rule concludes:

> Because this rule will maintain BLM's long-standing practice regarding mill sites, the rule does not create any new environmental impacts. Publishing this rule leads to the same environmental impacts as the no-action alternative because BLM is not changing the existing rules in any substantive way.

The BLM's reasoning is sound. It identified nine different agency documents dating from 1954 to 1991 in support of its conclusion that "[f]or nearly half a century, the BLM's written guidance has reflected the view that the mill site provision does not categorically limit the number of mill sites that may be located and patented for each mining claim." 68 Fed. Reg. at 61,054–55. In other words, the Final Rule did nothing more than withdraw the proposed rule and codify the status quo ante.

In their briefs and at oral argument, the appellants were unable to identify even a single instance in which the BLM relied upon the 1997 Opinion as a basis to reject a proposed mining plan. The one time the BLM announced its intention to apply the 1997 Opinion to a mining plan was dropped when the Congress enacted the aforementioned 1999 appropriation rider prohibiting it from doing so. *See* 68 Fed. Reg. at 61,055. There is no indication that, even after the 1999 appropriation rider had expired, the agency implemented the 1997 Opinion. In sum, the BLM never implemented the view expressed in the 1997 Opinion and the proposed rule. It follows that the Final Rule effected no change in the status quo and therefore had no "arguably significant consequences" for the human environment. *Myersville Citizens*, 783 F.3d at 1322.

16

The appellants argue the BLM ignored "the real on-the-ground impacts" of the Final Rule, which they characterize as embodying a "differing regulatory approach[]."  As explained above, however, the Final Rule did not change the status quo ante – it has no "real on-the-ground impacts" at all.  As we have held before, an agency's adoption of a policy that merely maintains the status quo is not a "major Federal action" for which the NEPA requires the agency to prepare an EIS.  *Fund for Animals, Inc. v. Thomas*, 127 F.3d 80, 82–84 (1997); *Sierra Club v. Andrus*, 581 F.2d 895, 902–03 (1978), *rev'd on other grounds*, 442 U.S. 347 (1979); *see also Comm. for Auto Resp. v. Solomon*, 603 F.2d 992, 1002–03 (1979) ("The duty to prepare an EIS normally is triggered when there is a proposal to change the status quo. . . .  Without a change in . . . policy . . . there is no proposal for major federal action significantly affecting the environment").  The Final Rule, therefore, was not a "major Federal action" within the meaning of the NEPA, and it was not arbitrary or capricious for the BLM not to prepare an EIS for the Final Rule.

The appellants rather lamely contend that a change in the status quo in fact had taken place.  They seize upon the word "return" in one sentence in the 2003 Opinion of the Solicitor: "Accordingly, the Department should return to its prevalent, pre-1997 administrative practice and interpretation, under which the mill site provision was interpreted as not imposing such numerical restrictions."  Above, p. 3, at 4.  It is perfectly clear in the Opinion itself, however, that the agency's use of the word "return" did not mean that practices had changed with the 1997 legal interpretation by the previous Solicitor.  To the contrary, the 2003 Opinion states that the 1997 Opinion had effected no change in practices: "As a result of the 1999 enactments, the 1997 Opinion has not been applied as the basis for denying a proposed mining plan."  *Id.* at 2.  "The Department

17

has administered the mill site provision in accordance with that view." *Id.* at 23.

Viewed in context, therefore, we see that the 2003 Opinion used "return" in the limited sense that it meant to repudiate the 1997 Opinion, which had never been implemented, and return to the Department's pre-existing stance; it did not suggest the Department was making a change that had practical environmental consequences requiring consideration and analysis in an EIS. *Cf., e.g.*, *Am. Wild Horse Pres. Campaign v. Perdue*, 873 F.3d 914, 930–31 (D.C. Cir. 2017) (holding arbitrary and capricious an agency's decision not to prepare an EIS when reversing a boundary change the agency contended had been purely "administrative," because the record showed the agency had been applying the change to its management decisions).

Even if the Department had applied the 1997 Opinion, moreover, the NEPA would not have required the Department to prepare an EIS. In its Notice of Proposed Rulemaking, 64 Fed. Reg. at 47,030 (NOPR), the BLM had determined the proposed rule was not a major Federal action that would significantly affect the human environment:

> We have analyzed this rule in accordance with the criteria of the [NEPA] . . . . Since no substantial changes are proposed, this rule does not constitute a major Federal action significantly affecting the quality of the human environment. Because this rule does not substantially change BLM's overall management objectives or environmental compliance requirements, it would have no impact or only marginally affect . . . critical elements of the human environment.

If adopting the proposed rule would not have significantly affected the human environment, then we fail to see how not

18

adopting the proposed rule could have a significant effect on the human environment.

That determination also dooms Earthworks' argument that the environmental assessment the Department prepared (perhaps needlessly) for the 2003 Final Rule failed to discharge its statutory duty to "study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources." 42 U.S.C. § 4332(2)(H). The alternative to withdrawing the proposed rule was to adopt it, which the BLM had already concluded would have no significant impact on the environment: The "ultimate impacts from mining would likely not change" because, as "[f]ormer Solicitor Leshy acknowledged," mining companies can acquire mill-site land in "at least two other ways." Environmental Assessment at 6–7 (quoting 1997 Opinion at 2).

Earthworks dismisses this justification as speculative, but whether it is speculative is of no consequence in this procedural setting. Again, the BLM had determined in its NOPR that the rule would not significantly affect the human environment. If the agency insufficiently considered the proposed rule as an alternative to the Final Rule, which we doubt, then the error was clearly harmless. *See, e.g.*, *Oglala Sioux Tribe v. NRC*, 45 F.4th 291, 300 (D.C. Cir. 2022) (error is harmless "when the agency has undertaken the required analysis but 'failed to comply precisely with NEPA procedures'" (quoting *Nevada v. Dep't of Energy*, 457 F.3d 78, 90 (D.C. Cir. 2006)).

Earthworks also maintains that, because the BLM did not solicit public comment on the environmental assessment in the Final Rule, the BLM violated the Interior Department regulation that requires it to provide public notice and the opportunity for involvement "to the extent practicable" during its prepara-

19

tion of an environmental assessment. 43 C.F.R. § 46.305(a)–
(b). The regulations also provide, however, that "the methods
for providing public notification and opportunities for public
involvement are at the discretion of the Responsible Official,"
43 C.F.R. § 46.305(a), and we have held the BLM has "signif-
icant discretion" in determining when and how to comply with
these regulations. *See Theodore Roosevelt Conservation
P'ship v. Salazar*, 616 F.3d 497, 519 (2010) (BLM "need not
include the public in the preparation of every EA").

In this case, the agency had good reason for not including
the public in the preparation of its environmental assessment,
as the district court so held. In response to the 1999 proposed
rule, the BLM had received public comments on the proposed
rule addressing mill sites and their environmental effects. 68
Fed. Reg. at 61,054. As we have seen, the Final Rule did noth-
ing more than decline to adopt the proposed rule and instead
codify the status quo ante, which had no effect on the human
environment. Therefore, it was not an abuse of discretion for
the BLM to conclude the notice given and comments received
regarding the proposed rule had satisfied its obligations under
the NEPA. Another round of notice and comment prior to is-
suing the Final Rule withdrawing the proposed rule and codi-
fying the status quo would have accomplished nothing but ex-
pense and delay.

**VI. The Administrative Procedure Act**

Finally, the appellants contend the Department violated
the notice provision of the APA, 5 U.S.C. § 553(b), by issuing
the Final Rule without an additional cycle of notice and com-
ment. They assert the 2003 Rule was not a "logical outgrowth"
of the proposed rule.

Under the APA, an agency must provide an opportunity
for notice and comment if a final rule is not a "logical out-

20

growth" of a proposed rule, because in that case notice of the proposed rule will have given the public no occasion to comment on what emerged as the final rule. *See, e.g.*, *Shell Oil Co. v. EPA*, 950 F.2d 741, 747 (D.C. Cir. 1991) ("If the deviation from the proposal is too sharp, the affected parties will not have had adequate notice and opportunity for comment").

In this case, the NOPR squarely raised the question whether Section 42 of the Mining Law limits a claimant to one five-acre mill site per mining claim, and it proposed to answer "yes" to that question. A negative answer to the question, like a positive answer, is a logical outgrowth of that proposition. As we said most recently in *New York v. EPA*, 413 F.3d 3, 44 (2005), "[o]ne outgrowth of a proposed rule is surely to refrain from taking the proposed step." So too is a decision to codify an interpretation reflected in decades of practice, as against a proposal to adopt a new, competing interpretation.

## VII. Conclusion

For the foregoing reasons, the judgment of the district court is

*Affirmed.*

PAN, *Circuit Judge*, dissenting:

Under the Mining Law of 1872, a mining company that claims public land for mining purposes may also claim nonmineral land to support its mining operations. Such nonmineral land is known as a "mill site," and no mill site "shall exceed five acres." 30 U.S.C. § 42; *see* 43 C.F.R. § 3832.31. This case requires us to determine whether the Mining Law limits mill-site land to a total of five acres per mining claim; or whether it allows a mining claimant to acquire an infinite number of five-acre mill sites, thereby imposing no real limit on mill sites at all. My colleagues in the majority adopt the "unlimited mill sites" approach, reasoning that nothing in the statute precludes such an interpretation. *See* Maj. Op. at 9–13. In my view, however, the text, structure, and historical context of the Mining Law compel the opposite reading. I therefore respectfully dissent.[1]

## I. Background

Understanding the issue before us requires us to delve into mining practices and regulations over the past 150 years. To start, the purpose of mining laws is to promote the development of mineral resources on public land. *See, e.g.*, *U.S. ex rel. U.S. Borax Co. v. Ickes*, 98 F.2d 271, 279 (D.C. Cir. 1938) ("[T]he general policy of the mining laws of the United States . . . has been to promote widespread development of mineral deposits and to afford mining opportunities to as many persons as possible."); *Orion Rsrvs. Ltd. P'ship v. Salazar*, 553 F.3d 697, 699 (D.C. Cir. 2009) ("To encourage mining in the western United States, Congress enacted the General Mining Law of

---

[1]     Because I would reverse and remand on statutory-interpretation grounds, I take no position on the majority's analysis of Appellants' claims under the National Environmental Policy Act and the Administrative Procedure Act's "logical outgrowth" doctrine. I concur with the majority's standing analysis.

2

1872 . . . .").  To that end, miners may claim land owned by the federal government for the purpose of conducting mining operations.  *See* 30 U.S.C. §§ 22, 26.  There are two types of federal land that may be claimed: mineral land and nonmineral land.  Mineral land is land containing "valuable mineral deposits" that can be mined.  *Id.* § 22.  Nonmineral land is everything else, and it can be used to support mining in various ways — including as a place to dispose of waste rock that is excavated in the process of mining.  Notably, however, there are competing, productive uses for public, nonmineral land: Such land can support homesteads, universities, and railroads, for example.  *See Watt v. W. Nuclear, Inc.*, 462 U.S. 36, 47 n.8 (1983) (describing other types of land grants).

For approximately the first century of our nation's history, "there was practically no legislation on the part of [C]ongress for the disposal of mines or mineral lands."  *Del Monte Min. & Mill. Co. v. Last Chance Min. & Mill. Co.*, 171 U.S. 55, 61 (1898).  But that did not mean that federal mineral land was left untouched.  Rather, "the fact of explorers searching the public domain for mines, and their possessory rights to the mines by them discovered, was generally recognized, and the rules and customs of miners in any particular district were enforced as valid."  *Id.* at 62.  In 1866 and 1870, Congress stepped in and passed two statutes that expressly incorporated local customs regarding mining rights.  *See* Lode Law of 1866 § 1, ch. 262, 14 Stat. 251, 251; Placer Act of 1870 § 12, ch. 235, 16 Stat. 217, 217.  Then came the Mining Law of 1872 — the source of the dispute before us.

**A.  The Mining Law**

The Mining Law of 1872 permits companies or individuals to file mining claims to gain rights to mineral land owned by the federal government.  30 U.S.C. § 23.  Each mining claim

3

can encompass up to approximately 20 acres of mineral land. *Id.* §§ 23, 35. Section 42 of the Mining Law allows mining claimants to also claim nonadjacent, nonmineral land to support their mining operations — *i.e.*, "for mining or milling purposes" — subject to requirements to survey the land and provide notice of the claim. *Id.* § 42. Such land is called a "mill site," and no mill-site claim can exceed five acres. *Id.* Although miners have options other than Section 42 to obtain public, nonmineral land to support their mining claims — including land exchanges, permits, or leases, *see* 43 U.S.C. §§ 1716(a), 1732(b) — Section 42 allows them to possess mill sites at no cost, aside from a few hundred dollars in processing fees.[2] *See* Bureau of Land Management, *Mining Claim Fees*, https://perma.cc/Q8R8-4A7K (last visited May 24, 2024). Alternatively, mining companies can, and have, acquired private rather than public land to facilitate their mining operations.

Section 42(a) of the Mining Law imposes the five-acre limit on mill sites with respect to "lode claims" — *i.e.*, mining claims based on veins or lodes of minerals found in rocks (such as gold, silver, tin, or copper). *See* Mining & Land Records System, *What Are the Different Types of Mining Claims or Sites?* (Jun. 16, 2023), https://perma.cc/WH5A-2ZM4. Lode

---

[2] The Mining Law also grants mining claimants the ability to "patent" (*i.e.*, acquire title to) the land, at a cost of only five dollars per acre, 30 U.S.C. § 29, but Congress has imposed a moratorium on such patents since 1994. *See Wyo-Ben Inc. v. Haaland*, 63 F.4th 857, 861–62 (10th Cir. 2023).

4

claims cannot exceed 1,500 by 600 feet, or approximately 20 acres. 30 U.S.C. § 23. Section 42(a) reads as follows:

(a) Vein or lode and mill site owners eligible

> Where nonmineral land not contiguous to the vein or lode is used or occupied by the proprietor of such vein or lode for mining or milling purposes, such nonadjacent surface ground may be embraced and included in an application for a [claim] for such vein or lode, and the same may be [claimed] therewith, subject to the same preliminary requirements as to survey and notice as are applicable to veins or lodes; but *no location made on and after May 10, 1872, of such nonadjacent land shall exceed five acres*, and payment for the same must be made at the same rate as fixed by sections 21, 22 to 24, 26 to 28, 29, 30, 33 to 48, 50 to 52, 71 to 76 of this title and section 661 of title 43 for the superficies of the lode. The owner of a quartz mill or reduction works, not owning a mine in connection therewith, may also receive a patent for his mill site, as provided in this section.

*Id.* § 42(a) (emphasis added).

In 1960, Congress amended the Mining Law to also allow mill-site claims in association with "placer claims" — *i.e.*, mining claims targeted at loose, unconsolidated materials (such as gravel by a river that might contain minerals). *See* Pub. L. No. 86-390, 74 Stat. 7, 7 (1960); Mining & Land Records System, *What Are the Different Types of Mining Claims or*

5

*Sites?* (Jun. 16, 2023), https://perma.cc/WH5A-2ZM4.  Placer claims are limited to 20 acres in size.  30 U.S.C. § 35.  The 1960 amendment added what is now Section 42(b), which adopts language similar to that used in Section 42(a) to impose a five-acre limit on "placer claim" mill sites:

> (b) Placer claim owners eligible
>
> > Where nonmineral land is needed by the proprietor of a placer claim for mining, milling, processing, beneficiation, or other operations in connection with such claim, and is used or occupied by the proprietor for such purposes, such land may be included in an application for . . . such claim, and may be [claimed] therewith subject to the same requirements as to survey and notice as are applicable to placers. *No location made of such nonmineral land shall exceed five acres* and payment for the same shall be made at the rate applicable to placer claims which do not include a vein or lode.

*Id.* § 42(b) (emphasis added).

## B.  Agency Interpretations of Section 42

The parties agree that Section 42 restricts a *single* mill site to no more than five acres.  The dispute before us concerns whether mining claimants are limited to a total of five acres of mill-site land per mining claim; or if Section 42 allows miners to claim an unlimited number of mill sites, so long as each claimed mill site is no greater than five acres in size.  Although the 2003 Rule challenged in this appeal adopts the "unlimited-mill-sites" interpretation, and the Department of the Interior

6

("DOI" or the "Department") now defends that reading, the agency also has endorsed the "five-acres-in-total" approach at other points in time.

In the first few decades after the enactment of the Mining Law, the DOI interpreted the statute in administrative proceedings to allow a total of five acres of mill-site land per mining claim. Specifically, in *J.B. Hoggin*, 2 Pub. Lands Dec. 755 (1884), the Department permitted multiple mill sites, but only if the collective size of the mill sites did not exceed five acres. And in *Hecla Consolidated Mining Co.*, 12 Pub. Lands Dec. 75 (1891), the Department held that a claimant could not claim additional mill sites simply because its existing, five-acre mill site was insufficient. At that time, the "typical mine" was "relatively small, and the surface of the mining claims together with the incident [five-acre-maximum] mill sites adequately served the needs of the mines for plant facilities and waste disposal areas." Twitty, Sievwright & Mills, *Legal Study of the Nonfuel Mineral Resources: Prepared Under Contract with the Public Land Law Review Commission, Vol. III* 1047 (1970).[3]

In the mid-twentieth century, however, the mining industry — and the Department's interpretation of the Mining Law — evolved. As underground mines near the surface became "mined out" and technology advanced, mines grew larger and deeper. Twitty, Sievwright & Mills at 1047–48. As a result, modern mining operations required "much larger areas

---

[3]     The five-acres-in-total reading of Section 42 persisted into the early twentieth century. Scholars of that era who wrote about the Mining Law also adopted the more restrictive understanding of the five-acre provision. *See* Curtis H. Lindley, *A Treatise on the American Law Related to Mines and Mineral Lands* 1175 (3d ed. 1914) ("It has been held that a lode proprietor may select more than one tract if the aggregate does not exceed five acres . . . .").

7

than formerly for the disposal of [waste]." *Id.* at 1048. In short, the mining industry needed more land. And the DOI adopted an unlimited-mill-sites policy to accommodate that need.

Beginning in 1954 and continuing into the 1990s, manuals published by the Bureau of Land Management ("BLM"), an agency within the DOI, consistently allowed for an unlimited number of mill sites associated with a single mining claim, so long as no individual mill site exceeded five acres. *See* J.A. 763–64 (examining BLM Manuals from throughout the second half of the twentieth century). Under that unlimited-mill-sites interpretation, miners could claim as much mill-site land as needed to support mining operations, provided that the claimants did so in five-acre increments. *See id.* The new policy in the BLM Manuals met the demands of modern mining, which calls for hundreds or even thousands of acres to accommodate activities such as waste-rock disposal. *See id.* at 759 n.15 (2003 Secretarial Opinion noting that, according to one 1966 study, "a miner would need 252 acres of surface area to excavate a 23-acre low-grade disseminated-copper ore body from under 400 feet of overburden"); *cf. Ctr. for Biological Diversity v. Fish & Wildlife Serv.*, 33 F.4th 1202, 1224 (9th Cir. 2022) (rejecting attempt by mining claimant to "permanently occupy 2,447 acres of National Forest land with its waste rock"). But for many decades, the DOI published no regulations or Secretarial Opinions that took a formal position on the proper interpretation of the five-acre limit in the Mining Law's mill-site provision.

In 1997, that changed. After decades of allowing unlimited five-acre mill sites per mining claim, the DOI reversed its approach and returned to its original understanding of the Mining Law, issuing an opinion that adopted the more restrictive five-acres-in-total interpretation of the statute ("1997 Opinion"). In the 1997 Opinion, the Solicitor of the

8

DOI — the agency's legal counsel — determined that Section 42 "provides that only one millsite of no more than five acres may be patented in association with each mining claim." J.A. 517. The Opinion clarified: "[W]hile only a total of five acres per [mining] claim may be patented as a millsite, that five acres may be broken up into more than one millsite claim." *Id.* The Solicitor directed the Department to "reject those portions of millsite patent applications that exceed this acreage limitation." *Id.* The Secretary of Interior concurred in the Opinion, *id.* at 531, making it "binding . . . on all other Departmental offices and officials" and subject to being "overruled or modified only by the Solicitor, the Deputy Secretary, or the Secretary." Dep't of Interior Departmental Manual, 209 DM 3.2(11) (1992) (available at https://perma.cc/U2KS-45TC).

Two years later, the DOI proposed a rule that would have codified the five-acres-in-total interpretation advanced by the 1997 Opinion. Specifically, the 1999 Proposed Rule included the following language:

> § 3832.32 How much land may I include in my mill site?
>
> A mill site must not exceed 5 acres in size. You may locate more than one mill site, so long as you do not locate more than an aggregate of 5 acres of mill site land for each 20-acre parcel of patented or unpatented placer or lode mining claims associated with that mill site land,

9

> regardless of the number of lode or placer
> claims located in the 20-acre parcel.

J.A. 807.

The 1997 Opinion and 1999 Proposed Rule caused an industry firestorm because mining projects that relied on many acres of mill-site land would not be approved under the new interpretation. In 1999, the DOI further panicked industry participants by rescinding its approval of certain claims associated with the Crown Jewel mine, a substantial mining project, "based on the Solicitor's [1997] Opinion." J.A. 126. As a result of that rescission, one company involved in the Crown Jewel venture lost over $100 million in market capitalization and "its share price sank to an all time low." *Id.* at 127.

Congress intervened, passing two appropriations riders that addressed the approval of mill-site claims. First, it prohibited the DOI from applying the 1997 Opinion retroactively, including to the Crown Jewel venture, mandating that the agency could not rely on the Opinion to deny any applications and plans of operations that were submitted before its issuance. Emergency Supplemental Appropriations of 1999, Pub. L. No. 106-31, §§ 3006(a), (c), 113 Stat. 57, 90–91. Then, Congress delayed implementation of the 1997 Opinion, prohibiting BLM and the Forest Service from spending appropriated funds in fiscal years 2000 and 2001 to deny certain applications based on the Opinion. Consolidated Appropriations Act of 2000, Pub. L. No. 106-113, § 337(a), 113 Stat. 1501, 1501A–199 (1999). Congress noted that this second piece of legislation should not be "construed as an explicit or tacit adoption, ratification, endorsement, approval, rejection or disapproval" of the 1997 Opinion. *Id.* § 337(b). Notably, Congress chose to limit the time frames for applying

10

the 1997 Opinion, but it did not override or alter the Opinion's interpretation of the Mining Law.

In October 2003, the DOI again reversed course. It issued a new opinion adopting the unlimited-mill-sites interpretation of Section 42 ("2003 Opinion"). In the 2003 Opinion, the Solicitor took the position that Section 42 "does not categorically limit the number of mill sites that may be located and patented to one for each mining claim." J.A. 741. That Opinion described the 1997 Opinion as "represent[ing] a departure from the Department's settled administrative practice and interpretation." *Id*. The Secretary of Interior again concurred, *id.* at 780, making the opinion binding on the Department, *see* Dep't of Interior Departmental Manual, 209 DM 3.2(11) (1992).

Shortly after the Department issued the 2003 Opinion, it promulgated the final 2003 Rule, at issue here, which adopted the unlimited-mill-sites interpretation of the Mining Law. *See* 68 Fed. Reg. 61,046–81 (Oct. 24, 2003) ("2003 Rule"). The 2003 Rule was the end product of the rulemaking initiated by the 1999 Proposed Rule, which had proposed to codify the five-acres-in-total reading of the Mining Law. *Id.* at 61,047–48; J.A. 807. The 2003 Rule stated:

§ 3832.32 How much land may I include in my mill site?

The maximum size of an individual mill site is 5 acres. You may locate more than one mill site per mining claim if you use each site for at least one of the purposes described in § 3832.34 of this part. You may locate only that amount of mill site acreage that is reasonably necessary to be used or occupied for efficient and

11

reasonably compact mining or milling operations.

43 C.F.R. § 3832.32. In other words, the 2003 Rule allows a mining company to claim a potentially unlimited amount of mill-site land (in five-acre increments) in association with a single mining claim.

## II. Standard of Review

Appellants argue that the 2003 Rule should be set aside under the Administrative Procedure Act because the Rule's adoption of the unlimited-mill-sites interpretation of Section 42 is contrary to law. *See* 5 U.S.C. § 706(2)(A) (A court must "hold unlawful and set aside agency action" that is "not in accordance with law."). Of course, if "the agency's decision is based on an erroneous view of the law, its decision cannot stand." *Transitional Hosps. Corp. of La. v. Shalala*, 222 F.3d 1019, 1024 (D.C. Cir. 2000) (cleaned up); *see also Am. Petroleum Inst. v. EPA*, 52 F.3d 1113, 1119 (D.C. Cir. 1995) (noting that agency action is contrary to law if it goes against a statute's clear meaning).

In determining the meaning of the 1872 Mining Law, "we must employ all the tools of statutory interpretation, including text, structure, purpose, and legislative history." *Loving v. IRS*, 742 F.3d 1013, 1016 (D.C. Cir. 2014) (cleaned up). We must interpret the statutory text "consistent with [its] ordinary meaning at the time Congress enacted the statute," *Heating, Air Conditioning & Refrigeration Distributors Int'l v. EPA*, 71 F.4th 59, 67–68 (D.C. Cir. 2023) (cleaned up); and we must keep in mind that "public land statutes should be interpreted in light of the condition of the country when the acts were passed," *Amoco Prod. Co. v. S. Ute Indian Tribe*, 526 U.S. 865, 875 (1999) (cleaned up). When interpretative tools render the statute's meaning clear, we "must give effect to Congress's

12

unambiguously expressed intent." *AFL-CIO v. FEC*, 333 F.3d 168, 172 (D.C. Cir. 2003). Under such circumstances, no deference is due to an agency's reading of a statute. *See id.* at 172–73.

## III.  Analysis

Applying the traditional tools of statutory interpretation, the meaning of the 1872 Mining Law is clear: The provision imposes a five-acre limit on the total amount of mill-site land per mining claim. The text, structure, and purpose of the statute, as well as the history against which it was enacted and congressional practice after the law was ratified, all support the five-acres-in-total interpretation. *Cf. CFPB v. Cmty. Fin. Servs. Ass'n of Am., Ltd.*, 601 U.S. 416, 426 (2024) (looking to "the Constitution's text, the history against which that text was enacted, and congressional practice immediately following ratification" to interpret the Appropriations Clause); *Loving*, 742 F.3d at 1016 ("[W]e must employ all the tools of statutory interpretation, including text, structure, purpose, and legislative history." (cleaned up)).

### A.  Statutory Text

Statutory interpretation must begin with the statute's text. *See, e.g.*, *Bellagio, LLC v. NLRB*, 863 F.3d 839, 847 (D.C. Cir. 2017). If that language is unambiguous, the inquiry can end there. *Schindler Elevator Corp. v. U.S. ex rel. Kirk*, 563 U.S. 401, 412 (2011); *Chao v. Day*, 436 F.3d 234, 235 (D.C. Cir. 2006). In relevant part, Section 42(a) states that when making a mining claim, "nonmineral land not contiguous" with the mining claim can also be claimed if it is "used . . . for mining or milling purposes," but "no location . . . of such nonadjacent [mill-site] land shall exceed five acres." 30 U.S.C. § 42(a); *see also id.* § 42(b) ("No location made of such nonmineral land

13

shall exceed five acres . . . .").[4]   The first phrase of the
provision describes the mill-site land that can be claimed — it
must be nonmineral, noncontiguous to the mining claim, and it
must be used for "mining or milling purposes."   The second
phrase specifies that "such nonadjacent land shall [not] exceed
five acres."   The most natural reading of "such nonadjacent
land" in the second phrase is that it refers to the previously
described mill-site land — the "nonmineral land not
contiguous" with the mining claim, which is "used for mining
or milling purposes."   *See A Dictionary of the English
Language* (Webster, et al., eds.) (1872) (defining "such" as
"[o]f that kind; of the like kind," "[o]f a character specified,"
or "[t]he same that"); *see also* Antonin Scalia and Bryan A.
Garner, *Reading Law: The Interpretation of Legal Texts* 78
(2012) ("Words must be given the meaning they had when the
text was adopted.").   Because the description of mill-site land
in the first phrase encompasses *all* of the nonmineral land that
can be claimed in connection with a particular mining claim,
so too does the second phrase which states that "such
nonadjacent land" may not "exceed five acres."   Thus, the
statute plainly limits the total amount of mill-site land to five
acres per mining claim.   Although Appellants do not argue that
the statute should be interpreted in precisely this way, a party
cannot forfeit the plain meaning of a statute.   *See UC Health v.
NLRB*, 803 F.3d 669, 679 n.5 (D.C. Cir. 2015) ("[P]arties
cannot waive the correct interpretation of the law by failing to

---

[4]   Section 42(b) reflects the 1960 amendment, in which Congress
adopted a five-acre limit on each mill site associated with a placer
claim.   The language in subsections (a) and (b) of Section 42 is
similar, and there is no reason to think that Congress intended the
later-added subsection (b) to bear a distinct interpretation of the five-
acre limit on mill sites.   I therefore focus on the text of subsection
(a), the provision that was first enacted in 1872, as well as original
intent and original public meaning in 1872.

14

invoke it." (cleaned up)); *EEOC v. FLRA*, 476 U.S. 19, 23 (1986) (same).[5]

## B.    Statutory Context and Structure

Although the meaning of the statutory text is plain, which may be enough in itself, *see Chao*, 436 F.3d at 235, the statute's context and structure also support the five-acres-in-total interpretation of Section 42. *See Loving*, 742 F.3d at 1016 (listing "structure" as among the "tools of statutory interpretation"); *Kiewit Power Constructors Co. v. Sec'y of Lab.*, 959 F.3d 381, 395 (D.C. Cir. 2020) ("[T]o assess the plainness or ambiguity of statutory language, we must also consider the broader context of the statute as a whole." (cleaned up)).

---

[5]    The majority relies on the words "no location of" in the statute, noting that "no location of" mill-site land can exceed five acres and asserting that the definition of "location" is "[t]he marking out or surveying of a tract of land (esp. of a 'claim') or a settlement." *See* 30 U.S.C. § 42; Maj. Op. at 12. Those words do not necessarily support a reading that multiple five-acre mill sites are permissible. As discussed, the statute's use of "nonadjacent land" refers to all of the mill-site land that can be claimed in connection with an individual mining claim. Thus, even under the majority's interpretation, when the statute says "no location . . . of such nonadjacent [millsite] land shall exceed five acres," it simply means that a mining claimant can "locate" — that is, "mark[] out or survey" — no more than five acres of mill-site land in total. To the extent that the majority's focus on "location" addresses the number of mill sites that can be claimed, it appears to allow just one mill site per mining claim and does not support the unlimited-mill-sites interpretation. In any event, the five-acres-in-total interpretation is the most natural reading of the statute and fits most comfortably with the structure and history of the law discussed *infra*, which the majority opinion does not meaningfully consider.

15

The primary focus of the Mining Law is to "promote the development of the mining resources of the United States," 45 Cong. Globe, 42d Cong., 2d Sess. 395 (1872), by earmarking public mineral lands for mining purposes, 30 U.S.C. § 21, and declaring all public mineral deposits open to exploration and purchase, *id.* § 22.  In alignment with that purpose, most of the statute is devoted to the regulation of mineral land — that is, the making and administration of mining claims.  *See generally* 30 U.S.C. § 21 *et seq.*  In the statutory scheme, mill sites play a supporting role to mining claims, which are the real stars of the show — mill sites essentially are "add-on" grants of nonmineral land, which are used to facilitate the extraction of minerals pursuant to the mining claims.  *See id.* § 42 (allowing claimants to "include[]" a mill-site claim in an application for a mining claim); *Alaska Copper Co.*, 32 Pub. Lands Dec. 128, 129–30 (1903) (DOI opinion stating that the mill-site provision's "manifest purpose is to permit [a mining claimant] to acquire a small tract of non-contiguous, non-mineral land as directly auxiliary to the prosecution of active mining operations upon his lode claim, or for the erection of quartz-mills or reduction works for the treatment of the ore produced by such operations").

Moreover, the statute takes pains to limit the size of public land grants:  Lode mining claims may not exceed 1500 feet by 600 feet (approximately 20 acres), 30 U.S.C. § 23; placer mining claims may not exceed 20 acres, *id.* § 35; and mill sites may not exceed five acres, *id.* § 42.  Interpreting Section 42 to impose a five-acres-in-total limit on mill sites appropriately reflects the intended relationship between the two types of claimed land, mineral and nonmineral, and gives effect to the size constraints explicitly delineated by Congress. By contrast, allowing miners to claim multiple five-acre mill sites means that the mill-site land — which is intended to *support* the associated mining claim — can instead dwarf the mining claim

16

in size. While a single mining claim can encompass only about 20 acres, the unlimited-mill-sites approach allows mining companies to claim hundreds or thousands of acres of related mill-site land. In short, permitting an unlimited number of mill sites is contrary to the structure of the statute and deprives the five-acre constraint of any real meaning. *See Life Techs. Corp. v. Promega Corp.*, 580 U.S. 140, 147 (2017) ("[W]e should favor an interpretation that gives meaning to each statutory provision."); *Donnelly v. FAA*, 411 F.3d 267, 271 (D.C. Cir. 2005) ("We must strive to interpret a statute to give meaning to every clause and word . . . .").[6]

## C.  Historical Evidence

### 1.  Original Intent and Original Public Meaning

The proper reading of the statute becomes even clearer when we consider the historical record. Importantly, we must adopt the ordinary meaning of the statute at the time it was written — 1872 — and "in light of the condition of the country when the act[] w[as] passed." *Amoco Prod. Co.*, 526 U.S. at 875 (cleaned up); *Heating, Air Conditioning & Refrigeration Distributors Int'l*, 71 F.4th at 67–68 (looking to the "ordinary meaning at the time Congress enacted the statute"). Indeed, we

---

6    The five-acre limitation is not entirely superfluous under the unlimited-mill-sites approach because each mill-site *claim* is still limited to five acres and the "amount of mill site acreage . . . [must be] reasonably necessary to be used or occupied for efficient and reasonably compact mining or milling operations." 43 C.F.R. § 3832.32; *see* 30 U.S.C. § 42. The Department asserts that, as a result, the provision forces a claimant to justify the milling purposes of the mill-site land on a five-acre-by-five-acre basis. But that is no meaningful restraint on miners who claim huge swaths of mill-site land that will be used to dispose of waste rock. In practice, the 2003 Rule reads Congress's carefully prescribed limits out of the statute.

17

must "interpret[] a statute in accord with the ordinary public meaning of its terms at the time of its enactment." *Bostock v. Clayton Cnty., Ga.*, 590 U.S. 644, 654 (2020); *see also Me. Lobstermen's Ass'n v. Nat'l Marine Fisheries Serv.*, 70 F.4th 582, 595 (D.C. Cir. 2023) ("We give the [statutory] term its ordinary, contemporary, common meaning." (cleaned up)). We also should give effect to the original intent of the Congress that enacted the legislation. *See FBI v. Abramson*, 456 U.S. 615, 644 (1982) (O'Connor, J., dissenting) ("Our task is solely to give effect to the intentions, as best they can be determined, of the Congress that enacted the legislation."); *AFL-CIO*, 333 F.3d at 172 (noting that we "must give effect to Congress's unambiguously expressed intent"). Here, the original intent of Congress and the original public meaning in 1872 favor the five-acres-in-total approach.

At the time that Section 42 was first enacted, the standard mining claim — limited to approximately 20 acres in size — did not need more than five acres of mill-site land to support it. *See* Twitty, Sievwright & Mills at 1047; *Alaska Copper Co.*, 32 Pub. Lands Dec. at 130 ("The area of such additional tract is by the terms of the statute restricted to five acres, as obviously ample for either purpose [of a mill site]."). And while the purpose of the Mining Law was to "promote the development of the mining resources of the United States," 45 Cong. Globe, 42d Cong., 2d Sess. 395 (1872), that goal places particular weight on ensuring that *mineral* land will be devoted to mining purposes. *See Watt*, 462 U.S. at 47 n.8 ("[M]ineral land was exempted from the homestead laws, from statutes granting lands to railroads, and from a statute granting land to states for agricultural colleges. If land was classified as mineral land, it could not be conveyed under these statutes." (citations omitted)); *United States v. Coleman*, 390 U.S. 599, 602 (1968) ("Under the mining laws Congress has made public lands available to people for the purpose of mining valuable

18

mineral deposits and not for other purposes."). Nonmineral land was not the focus of the law, and such public land had, and still has, other valuable uses — such as supporting homesteads, railroads, and public universities. *See Watt*, 462 U.S. at 47 n.8. Congress had no reason in 1872 to allow vast expanses of *nonmineral* land to be appropriated for mining purposes.

The Department's near-contemporaneous interpretations of Section 42 after the Mining Law's passage are powerful evidence of the statute's original public meaning. *Cont'l Airlines, Inc. v. DOT*, 856 F.2d 209, 217 (D.C. Cir. 1988) ("We give more weight to [the] contemporaneous interpretation than to the agency's current view."); *Bankamerica Corp. v. United States*, 462 U.S. 122, 130 (1983) (noting the Court's "long-held policy of giving great weight to the contemporaneous interpretation of a challenged statute by an agency charged with its enforcement"). Agency opinions from the relevant era confirm that the Department understood Section 42 to allow a total of five acres of mill-site land to be claimed in conjunction with each individual mining claim.

First, in *J.B. Hoggin*, a DOI decision from 1884, the General Land Office initially denied a request for two mill sites in connection with one lode claim. *See* J.A. 524. On appeal, the Secretary reversed and authorized the mill sites because one was 4.5 acres and the other 0.5 acres, falling within the Mining Law's five-acres-in-total requirement. *J.B. Hoggin*, 2 Pub. Lands Dec. at 755–56. If multiple mill sites automatically were allowed, with no limit on total acreage, the DOI would have had no need to issue such a clarifying opinion.

The DOI reiterated the five-acres-in-total limitation in *Hecla Consolidated Mining Co.*, 12 Pub. Lands Dec. 75 (1891). In that case, applicants for a mill site sought additional land because "[t]he amount acquired under the former mill-site

19

claims . . . [wa]s not sufficient for their purposes." *Id*. at 77. But the Department responded by saying that "[t]he law makes no provision for acquiring land as mill sites additional to or in connection with existing mill sites, but on the contrary expressly limits the amount of land to be taken in connection with a mill to five acres. To allow this application as now made would be to disregard this limitation." *Id*. That articulation of the five-acres-in-total interpretation of Section 42 could not be clearer. It does not contemplate granting multiple five-acre mill sites to address the applicants' complaint that the amount of land at their disposal was "not sufficient for their purposes."

### 2.    Congressional Action and Understanding

Congressional practice after the Mining Law's enactment also is instructive. There is no evidence that Congress ever intended the unlimited-mill-sites meaning. To the contrary, Congress has understood the five-acres-in-total interpretation to be the prevailing view of the law and it has never rejected that approach.

First, Congress apparently assumed that the Mining Law mandated a five-acres-in-total limit on mill sites when it amended Section 42 in the mid-twentieth century. In 1959, Congress began to consider extending mill-site claims to support placer mining claims, but it refused to adopt a proposed ten-acre limitation on the size of the mill sites, fearing that it would allow claimants to receive too much land. J.A. 522 (citing S. Rep. No. 904, 86th Cong., 1st Sess., at 3.). The proposed language applied to individual *claimants* (not *claims*), and the DOI argued that allowing ten acres for each claimant would have allowed "a number of individual claimants to band together to receive far more than 10 acres at one site." *Id*. That would not have been a concern if Section 42 already allowed an unlimited number of five-acre mill sites

20

associated with the same mining claim, which would have enabled routine circumvention of the existing limit. Congress ultimately adopted a five-acre limit on all placer-claim mill sites. *See* 30 U.S.C. § 42(b).

Subsequently, expert reports to Congress on mining and land use also assumed a five-acres-in-total maximum on mill sites. In fact, the experts argued that the statutory five-acre limit on nonmineral land was insufficient to meet the demands of modern mining.

The 1970 Public Land Law Review Commission Report to Congress noted that one of the "weaknesses" of the Mining Law is the "inadequate provision for the acquisition of land for related purposes such as locating a mill." *One Third of the Nation's Land: A Report to the President and to the Congress by the Public Land Law Review Commission* 124 (1970) ("PLLRC Report"). The PLLRC Report argued that additional land was needed to "meet all reasonable requirements for a mineral operation, such as settling ponds, mills, tailing deposits, etc." — typical uses of mill sites. *Id*. at 128. But, despite the needs of a modern mining operation, the existing law "allow[ed] only 5 acres for each millsite in addition to the actual claim acreages, and this clearly has been inadequate in many cases." *Id.* The issue described by the PLLRC Report presupposed that miners could not stake additional five-acre mill-site claims to fulfill their needs.

A 1979 study from the congressional Office of Technology Assessment further supports that view. *Management of Fuel and Nonfuel Minerals in Federal Land* (April 1979). The 1979 report notes that "[t]here are substantial limitations on the location and use of millsites." *Id.* at 126. Recognizing that "[t]hese limitations were probably not restrictive in 1872 when mining operations were small," the

21

report notes that modern mining requires much more land to dispose of "enormous quantities of waste rock and tailings." *Id*. at 127. The current mill-site provision could not satisfy this demand for surface space as "[t]here could be at most as many millsites as there are mining claims, and each millsite would be at most one-fourth the size of the typical 20-acre claim, so that the millsites, in aggregate, would be one-fourth the size of the ore body encompassed by the claims." *Id*.

Finally, further evidence of Congress's understanding can be gleaned from its reaction to the 1997 Opinion, which adopted the more restrictive, five-acres-in-total interpretation of Section 42. Faced with industry uproar, Congress acted by delaying the implementation of the Opinion for two years and prohibiting its deployment to deny pre-1997 applications. Emergency Supplemental Appropriations of 1999 § 3006(c), 113 Stat. at 90–91; Consolidated Appropriations Act of 2000 § 337(a), 113 Stat. at 1501A–199. Tellingly, Congress did not override or alter the agency's restrictive interpretation of Section 42, as reflected in the 1997 Opinion, despite Congress's apparent desire to ease the Opinion's burden on the mining industry. And yet, if Congress had believed that the 1997 Opinion misinterpreted Section 42, it simply could have said so. Thus, congressional practices and actions since the Mining Law's enactment all point in the same direction — to a five-acres-in-total reading of the statute.

### 3. BLM Manuals

The only historical evidence that arguably weighs in favor of the unlimited-mill-sites interpretation is prior agency practice, from 1954 until 1997. During that period, BLM Manuals reflected a policy of allowing mining claimants to claim an unlimited number of five-acre mill sites in association with a single mining claim. But that BLM-approved practice

22

was adopted long after the statute's enactment, in response to new conditions in an evolving industry; and it was not codified or placed in the federal regulations until the 2003 Rule. Thus, the BLM Manuals shed no light on the original public meaning of the 1872 Mining Law. *See Amoco Prod. Co.*, 526 U.S. at 875 (requiring interpretation of public land statutes "in light of the condition of the country" at the time of enactment (cleaned up)); *Allied-Bruce Terminix Cos., Inc. v. Dobson*, 513 U.S. 265, 292 (1995) (Thomas, J., dissenting) (noting that a "later development could not change the original meaning of the statute that Congress enacted"). Although the BLM may have had good reason to accommodate the mining industry's need for larger land grants in the twentieth century, "we are not authorized to rewrite statutory text simply because we might think it should be updated." *District of Columbia v. Dep't of Lab.*, 819 F.3d 444, 450 (D.C. Cir. 2016); *see also id.* ("When a new situation arises outside the scope of an old statute, the proper approach under our system of separation of powers is for Congress to amend the statute, not for the Executive Branch and the courts to rewrite the statute beyond what the statute's terms can reasonably bear."); *McGirt v. Oklahoma*, 140 S. Ct. 2452, 2474 (2020) (disclaiming the authority to rely on "the 'practical advantages' of ignoring the written law").

\*   \*   \*

Applying "traditional tools of statutory construction," I conclude that Congress "unambiguously expressed [its] intent," *AFL-CIO*, 333 F.3d at 172:  Mill-site land cannot exceed five acres in total per mining claim. The Mining Law's text and structure, as well as historical evidence and congressional practice after the law's enactment, all weigh heavily in favor of the more restrictive reading of the mill-site provision. Because the majority fails to give effect to the clear meaning of the statute, I respectfully dissent.  I would reverse

23

the district court's entry of summary judgment in favor of BLM, and I would remand with instructions to vacate the 2003 Rule as contrary to law.